UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MICHAEL   T.,[1]

                            Plaintiff                         DECISION AND ORDER

-vs-

                                                  1:19-CV-0956 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                            Defendant.

_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. §

1383(c)(3) to review a decision of the Commissioner of Social Security that terminated

Plaintiff's disability benefits pursuant to 42 U.S.C. § 423(f)(1) after his medical condition

improved.[2]  In that regard, there is no dispute that the medical condition (larynx cancer)

which had previously rendered Plaintiff disabled improved and went into remission

following treatment.   Rather, the issue is whether despite such improvement, that

condition, along with other mental and physical impairments, were, in combination,

disabling during the relevant period.[3]   Now before the Court is Plaintiff's motion (ECF

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

[2]  § 423(f)(1) states: "(f) Standard of review for termination of disability benefits.   A recipient of benefits under this subchapter or subchapter XVIII based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by-- (1) substantial evidence which demonstrates that-- (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity;" 42 U.S.C.A. § 423 (West)

[3]  There is no dispute that the relevant period is December 18, 2015 (the date the Commissioner

1

No. 12) for judgment on the pleadings and Defendant's cross-motion (ECF No. 16) for

the same relief.   For the reasons discussed below, Plaintiff's application is denied,

Defendant's application is granted, and this action is dismissed.

STANDARDS OF LAW

The Commissioner decides whether a claimant is no longer disabled by following

an eight-step evaluation process, *see*, 42 U.S.C. § 423(f) and related regulations, 20

C.F.R. § 404.1594(f)(1)-(8).[4]   Under this test, the Commissioner bears the burden of

---

maintains Plaintiff's disability ended) through December 7, 2017 (the date of the ALJ's decision).

[4] (f) Evaluation steps. To assure that disability reviews are carried out in a uniform manner, that decisions of continuing disability can be made in the most expeditious and administratively efficient way, and that any decisions to stop disability benefits are made objectively, neutrally and are fully documented, we will follow specific steps in reviewing the question of whether your disability continues. Our review may cease and benefits may be continued at any point if we determine there is sufficient evidence to find that you are still unable to engage in substantial gainful activity. The steps are as follows. (See paragraph (i) of this section if you work during your current period of entitlement based on disability or during certain other periods.) (1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section). (2) If you are not, has there been an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.   (3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)   (4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).   (5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.   (6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.   (7) If your impairment(s) is severe, we will assess your current ability to do substantial gainful

proving that the claimant is no longer disabled. *See, e.g., Dunn v. Comm'r*, No. 17CV1256, 2019 WL 336938, at *3 (W.D.N.Y. Jan. 28, 2019) ("The burden is upon defendant Commissioner to establish the eight steps to show medical improvement, 20 C.F.R. § 404.1594(f).") (citation omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   In relevant part, Section 405(g) states that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.

---

activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended. (8) If you are not   able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (f)(7) of this section and your age, education, and past work experience (see paragraph (f)(9) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.   (9) We may proceed to the final step, described in paragraph (f)(8) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (f)(7) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (f)(7) of this section. If we find that you may be unable to adjust to other work or if § 404.1562 may apply, we will assess your claim under paragraph (f)(7) of this section and make a finding about whether you can perform your past relevant work.

1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge ("] ALJ["]). Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

Here, there is no dispute that the Administrative Law Judge ("ALJ") applied the correct eight-step test.   Rather, the issue is whether the ALJ's determination is otherwise affected by legal error or unsupported by substantial evidence.[5]   Specifically, the question is whether, when making her finding concerning Plaintiff's residual functional capacity ("RFC"), the ALJ erroneously relied on her "own lay interpretation of bare medical findings rather than substantial evidence," as Plaintiff maintains.[6]   For the reasons to be discussed below, the Court answers that question in the negative.

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this

---

[5]  *See, e.g., Osborn v. Astrue*, 406 F. App'x 296, 298 (10th Cir. 2010) ("Employing a de novo standard of review, 'we independently determine whether the ALJ's decision is free from legal error and supported by substantial evidence.'") (citation omitted).
[6]  Pl. Memo of Law at p. 1.

action.   The Court will refer to the record only as necessary for purposes of this Decision and Order.

In 2011, the Commissioner found that Plaintiff was disabled due to throat cancer. (Tr. 102).   Plaintiff's cancer was successfully treated with radiation and went into remission.   Plaintiff continued to receive disability payments until the Commissioner determined that his condition had improved and that as of December 18, 2015, Plaintiff was no longer disabled.

Plaintiff also has a history of mental health problems and has complained of anxiety, depression and poor anger management.   Plaintiff graduated from high school with an "IEP diploma," and was in special education classes due to behavior problems and low academic achievement. (Tr. 290).   Plaintiff has worked at various jobs, including as a garbage truck driver.   Plaintiff is divorced and has two teenage sons.   At the time of the administrative hearing in this matter, Plaintiff was forty-two years of age and resided with his girlfriend. (Tr. 47).

In 2013, Plaintiff was admitted to the hospital for three days of inpatient mental health treatment after he allegedly expressed suicidal ideation to someone, though he himself denied being suicidal.   In fact, it appears Plaintiff was admitted because he posed a threat of violence to others, not to himself. (Tr. 290, 292).   Notably, in that regard, this incident took place after Plaintiff threatened a girlfriend with a razor.   At that time Plaintiff was fearful of going to jail, as he was on probation and had nine prior arrests for domestic violence. (Tr. 290).[7]   Upon admission, the diagnosis was Bipolar I

---

[7] On February 2, 2016, Northwest Community Mental Health Center ("Northwest") provided a treatment

disorder with antisocial personality traits. (Tr. 291).   After his medication was adjusted, Plaintiff was reported as having an essentially normal mental status examination, with no depression, but with mild anxiety and fair attention and concentration. (Tr. 291). Upon discharge, the diagnosis had been changed to "mood disorder not otherwise specified." (Tr. 294).[8]

Subsequent mental status examinations were generally unremarkable, though Plaintiff did at times exhibit depression, anxiety and poor judgment. (Tr. 300, 303, 308, 312, 315, 902, 908, 918).   Plaintiff took Klonopin as needed for anxiety.   On November 10, 2014, at an annual physical with his primary care doctor, it was noted that Plaintiff continued to see a mental health therapist, though he denied having anxiety or depression. (Tr. 468, 470).   On April 23, 2015, Plaintiff was reported as having no cognitive or functional deficits. (Tr. 915).   At medical office visits in May 2015 and June 2015, Plaintiff denied being anxious or depressed and his mental status examinations were normal. (Tr. 483-484, 488-489).

On December 1, 2015, Plaintiff's primary care doctor noted that Plaintiff reported receiving continued treatment for anxiety and depression, though Plaintiff denied having anxiety, depression, inability to focus, inability to concentrate or panic attacks. (Tr. 599).

---

summary in connection with Plaintiff's disability claim. (Tr. 618-619).   Northwest noted that it had provided treatment to Plaintiff in 2012 and 2013, upon a referral by Plaintiff's probation officer, who indicated that Plaintiff needed help with "anger management and control issues." (Tr. 618). Northwest indicated that its diagnostic impression was "antisocial personality disorder." (Tr. 618).

[8] Regarding the reference to a bipolar diagnosis, the Court observes that in 2018, a treating psychiatrist indicated that Plaintiff had a history of "mood disorder," but that it was "unclear if it is bipolar type." (Tr. 1094).   The psychiatrist indicated that, according to Plaintiff's mother, Plaintiff had never been formally diagnosed as having bipolar disorder. (Tr. 1094).   The psychiatrist's own diagnosis was "mood disorder due to known physiological condition, unspecified." (Tr. 1095).

On January 15, 2016, Plaintiff began new mental health treatment after being terminated as a patient a year earlier for failing to keep appointments. (Tr. 624). At the time of the initial intake, Plaintiff reported that he was facing the termination of his disability benefits and had hired an attorney to "fight it." (Tr. 626).   A mental status examination was generally unremarkable except for some reported anxiety and "fair to poor" judgment and insight. (Tr. 626).   Plaintiff's chief complaint was feeling "anxious." (Tr. 631).   On July 19, 2016, a mental status examination was normal, except for "agitated mood." (Tr. 753).   On December 5, 2016, Plaintiff's doctor reported "no current emotional problems." (Tr. 825).   On May 2, 2017, a mental status exam was normal. (Tr. 656).   On April 19, 2017, an emergency room doctor reported that upon treating Plaintiff, he observed "no cognitive and/or functional deficits." (Tr. 924).

Regarding Plaintiff's pursuit of mental health treatment generally, one agency medical reviewer aptly noted that, although Plaintiff may have "psychiatric and learning problems," he "has a history of intermittent short term counseling for most[ly] psychosocial issues, legal problems, domestic violence, probation." (Tr. 635).   In that regard, the reviewer noted, for example, that the two occasions on which Plaintiff sought emergency or inpatient mental health treatment were both "in the wake of pending legal" troubles. (Tr. 635).

Although Plaintiff's laryngeal cancer was successfully treated, he continued to experience difficulty swallowing at times. (Tr. 353, 414).   Plaintiff also received treatment for several physical ailments unrelated to his cancer.   For example, in 2013, Plaintiff complained of right shoulder pain that resolved with physical therapy. (Tr. 353).

In July 2014, Plaintiff had ankle surgery following a sprain to his left ankle after he slipped on the stairs of an apartment building. (Tr. 385).   After the ankle surgery, Plaintiff was generally noncompliant with various post-op treatment recommendations. (Tr. 852-853).   In connection with that same ankle injury, Plaintiff's physical therapist noted that both he and Plaintiff's orthopedic surgeon were perplexed by the severity of Plaintiff's continued complaints of pain after the surgery, since "the magnitude" of Plaintiff's complaints "cannot be explained at our current level of knowledge and understanding of his pathology." (Tr. 853).

In August 2014, Plaintiff's primary care doctor noted that Plaintiff's physical examination was normal except for swelling in the left ankle. (Tr. 464-465).   In November 2014, Plaintiff's primary care doctor noted that Plaintiff had "recovered" from the ankle surgery and was continuing to attend physical therapy. (Tr. 468).   At that same visit, a physical examination was normal. (Tr. 468-469).   In May 2015, Plaintiff's primary care doctor reported that Plaintiff's ankle injury was "resolved." (Tr. 485).

Plaintiff also claims to have ongoing problems with his knees and has received orthopedic treatment including surgery on his right knee.   Although, on October 28, 2014, Plaintiff reportedly told his orthopedic surgeon that his left knee, about which he had previously complained, felt "fine," and he declined a pain injection. (Tr. 783, 784) ("He states his knee feels fine.").   Additionally, as mentioned earlier, a complete physical examination was performed in November 2014, and that examination was negative for any physical or musculoskeletal problems. (Tr. 468-469).   On April 16, 2015, Plaintiff visited his primary care doctor without mentioning any knee problems,

and the doctor's physical examination was normal. (Tr. 479-480).   A follow-up visit in May 2015 was similarly negative as to any knee problem or other physical complaints or findings. (Tr. 484-485).

Plaintiff has also complained of ongoing neck pain.   In that regard, in 2012, many years prior to the relevant period, Plaintiff had surgery on his neck following a motor vehicle accident, with fusion performed at the C6-C7 vertebrae. (Tr. 526, 530). Subsequently, as noted earlier, multiple physical examinations in 2014 and 2015 were negative for any spinal problems.   However, on August 24, 2015, Plaintiff went to the emergency room complaining of pain in the back of his neck that had started a few days earlier. (Tr. 526).   Plaintiff indicated, though, that the pain had improved.   A CT scan of the cervical spine showed "early degenerative disc disease at C6/C7 without significant effect on the canal or the neuroforamina." (Tr. 534).

On December 1, 2015, Plaintiff established a treating relationship with a new primary care doctor, stating that he "generally felt well with minor complaints." (Tr. 598). Plaintiff did not complain of neck pain *per se*, but he did indicate that he was having numbness and tingling in his left arm, sometimes extending up to his neck, as well as pain in his right arm that had been bothering him for "years." (Tr. 598).   Upon examination, Plaintiff had full strength in his extremities, with no musculoskeletal abnormalities. (Tr. 600).

On December 5, 2016, Plaintiff's primary care physician performed an annual physical exam and noted that Plaintiff reported "feeling well with minor complaints and good energy level" and "no current emotional problems." (Tr. 825).   Plaintiff did not

complain of pain in the neck, ankle or knees.   Plaintiff did complain, however, of "arm numbness and tingling" in both arms, which the doctor referred to as "diabetes related symptoms." (Tr. 825).   Nevertheless, the doctor noted that Plaintiff's Type II diabetes was controlled even though Plaintiff was not following any special diet or taking any medications whatsoever. (Tr. 825).   The results of the doctor's physical, neurological and mental status examinations were completely normal (Tr. 826-828).

In April 2017, Plaintiff went to the emergency room complaining of pain in his right hand, "with no history of injury." (Tr. 922).   Plaintiff complained of "tingling, throbbing and numbness" and pain that was "ten out of ten on a pain scale." (Tr. 922).   Plaintiff stated that the condition had started suddenly two weeks earlier.   The doctor reported that Plaintiff appeared uncomfortable, but was otherwise in no apparent distress, with no cognitive or functional deficits and full range of motion in all extremities.   The doctor diagnosed a finger sprain, advised Plaintiff to apply ice, and told him to follow up with an orthopedic doctor if necessary.   The doctor further indicated that despite Plaintiff's complaint of extreme pain, "[a]t their worst the symptoms were very mild." (Tr. 925).   The doctor further noted that, apart from attempting to "pop" and pull on his finger, Plaintiff had not done anything to alleviate his pain, such as taking pain medication. (Tr. 925).[9]

Unfortunately, in July 2018, Plaintiff suffered a stroke related to a blocked carotid artery.   However, that was long after the relevant period at issue in this action, which

---

[9] This is a recurring theme in the record.   For example, at the administrative hearing Plaintiff told the ALJ that he had been having long-term pain in various parts of his body, but he admitted that he was not taking any pain medication.

ended on December 7, 2017.

The medical record contains a few references to Plaintiff working, planning to work or otherwise engaging in business.   On May 6, 2014, and again in July 2014, Plaintiff's ankle surgeon noted that Plaintiff had been working despite being categorized as disabled. (Tr. 766-767) ("He is on disability, as he is on medicare, however he is a truck driver and landscaper."); (Tr. 775) ("He is a truck driver and landscaper prior to injuring his ankle, which is confusing considering he is on disability.").   On February 5, 2015, Plaintiff told his ankle surgeon that he had been "busy" "moving snow." (Tr. 791). On April 14, 2015, Plaintiff told his therapist that he had been working. (Tr. 500).   On February 11, 2016, Plaintiff reportedly told his therapist that he was in the process of buying a house through a first-time homebuyer's program, with the condition that he fix-up the house within eighteen months, and that he was also considering using money from an impending settlement of a claim involving his ankle injury "slip and fall" to buy another house. (Tr. 628).   In July 2016, Plaintiff told his doctor that he needed a note to return to work full time. (Tr. 817).   On September 15, 2016, Plaintiff told his therapist that he had been working driving a truck and delivering ice, but that he had quit the job because his boss had threatened him. (Tr. 744).

The record contains various medical/psychiatric opinions, only one of which is particularly helpful to Plaintiff's claim of total disability.   Specifically, on June 10, 2016, Plaintiff's therapist, Richard Dopson LCSW ("Dopson"), wrote a report strongly indicating that Plaintiff had no useful ability to work competitively. (Tr. 639-643).   The Court observes, however, that as just mentioned above, a month after Dopson wrote

this report, Plaintiff was asking his doctor for a note indicating that he could return to work full time. (Tr. 817).   Nevertheless, Dopson purported to diagnose Plaintiff with depressive disorder, obsessive compulsive disorder, panic disorder without agoraphobia, "mental retardation unspecified" and personality disorder not otherwise specified.   Dopson indicated that Plaintiff has an explosive temper, leading to "significant problems with women and road rage," that would prevent him from working with or around other people.   Dopson indicated that Plaintiff essentially had no useful ability to perform any mental aspect of work, including any ability to follow directions, follow rules, interact with people, use judgment, behave in an emotionally stable manner, or stay on task at least 75% of the time.

The record also contains various opinions from examining and non-examining agency medical doctors, psychiatrists and psychologists who evaluated Plaintiff in connection with his disability claim.   All these evaluators opined that Plaintiff had the physical and mental abilities to work at least at the sedentary level. (Tr. 558-562, 563-566, 577, 579-593, 634, 636-637).   These evaluations were all performed in 2015 and 2016.

As relevant to one of Plaintiff's arguments in this action which will be discussed below, the Court notes that as part of the evaluation of Plaintiff's claim, a disability analyst suggested that the Commissioner should obtain additional IQ testing of Plaintiff. (The record already contained IQ test results from when Plaintiff was in school, Tr. 284-288).   However, a consultative agency review psychologist, S. Juriga, Ph.D. ("Juriga"), indicated that the need for any further IQ testing was negated by Plaintiff's "significant

work history."[10]  (Tr. 635-637).   Consequently, no further IQ testing was performed.

On October 6, 2015, consulting psychologist Janine Ippolito, Psy.D. ("Ippolito") examined Plaintiff and prepared a psychiatric evaluation. (Tr. 558-562).   Ippolito's diagnosis was "mood disorder with mixed anxiety and depressed mood."   Ippolito indicated that Plaintiff's mental status was generally normal, except for "estimated" "average to below average intellectual functioning" and somewhat impaired attention and concentration related to "suspected limited intellectual functioning."   However, Ippolito found that Plaintiff was able to understand and follow simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions and relate adequately with others, all without limitation. Ippolito further found that Plaintiff could handle stress, with mild to moderate limitations.

Also, on October 6, 2015, Hongbiao Liu, M.D. ("Liu") conducted a consultative internal medicine examination of Plaintiff. (Tr. 563-566).   Plaintiff told Liu that he had "constant" "full body" pain, "pain level 5/10," as well as numbness and tingling in both hands. (Tr. 563).   As an aside, the Court notes that, as discussed earlier, it was only two months after this examination, on December 1, 2015, that Plaintiff told his primary care doctor that he "generally felt well with minor complaints." (Tr. 598).   In any event, Plaintiff further told Dr. Liu that he could only lift ten pounds and needed to change position every five minutes while sitting or standing. (Tr. 563).   Plaintiff also reportedly told Liu that he was unable to walk heel-to-toe or squat, due to low back pain, which, as

---

[10]  Plaintiff has held various jobs including that of garbage truck driver.

far as the Court can recall, may be the only mention of low-back pain in the record. Nevertheless, upon examination. Liu found Plaintiff to be in no apparent distress, with normal neurologic signs and full strength in the upper and lower extremities, some limited range of motion in the spine and shoulder, and full range of motion in the elbows, forearms, wrists, hips, knees and ankles. (Tr. 565).   Liu also reported that Plaintiff had intact hand and finger dexterity and full grip strength bilaterally.   Liu's medical opinion was that Plaintiff had only "mild to moderate limitations for prolonged walking, bending, kneeling or overhead reaching." (Tr. 566).

At the administrative hearing (10/4/17) Plaintiff indicated that he has severe, near-constant pain in his neck, right hand, left ankle and both knees, but that he does not take any pain medication for any of those problems.   Plaintiff further stated that his diabetes was "out of control." (Tr. 56).   Nevertheless, Plaintiff stated that he can stand or walk for approximately 25 minutes at a time and sit for about an hour at a time. (Tr. 80).   Plaintiff also stated that he can lift 25 pounds, though he felt that he could only do so 3 or 4 times per day. (Tr. 81).

On December 4, 2017, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the date that Plaintiff's benefits were terminated and the date of her decision.   In pertinent part, the ALJ made a detailed RFC finding that did not track exactly any medical opinion of record. (Tr. 26).   Due to the length of the RFC finding, the Court will not restate it here.   However, it is sufficient to note that the ALJ found Plaintiff could perform sedentary work, with restrictions including the following: ability to change position from sitting to standing; sit for not more than one hour at a

time and stand for not more than thirty minutes at a time; only frequently push and pull; only occasionally climb ramps and stairs; only frequently handle, finger and feel; never perform prolonged forceful gripping or grasping with the right hand; perform frequent but not constant movement of the neck; perform simple, routine and repetitive tasks; work in a low stress environment; and have only occasional contact and interaction with supervisors, co-workers and the public.

In arriving at this RFC, the ALJ found that Plaintiff's subjective complaints were not entirely credible in light of the entire record, and the Court would note that finding is clearly supported by substantial evidence.   More significantly, for purposes of this action, the ALJ discussed the various medical opinion evidence and gave partial weight to each of the opinions by Ippolito, Liu and Popson.   In that regard, the ALJ gave a detailed explanation as to which parts of each opinion she accepted, which parts she did not accept, and how each opinion formed the basis for the particular RFC findings insofar as it was consistent with the rest of the medical evidence.   For example, whereas Ippolito indicated that Plaintiff could interact with others without limitation, and Popson indicated that Plaintiff could not interact with others at all, the ALJ found, based on the entire record, that Plaintiff could have occasional interaction with people. (Tr.29-30).   Similarly, whereas Liu indicated that Plaintiff had no limitations regarding hand strength or dexterity, the ALJ gave that opinion only partial weight and found, based on the entire record, that Plaintiff was limited in his ability to perform prolonged gripping and grasping. (Tr. 30).

The ALJ went on to find that Plaintiff could not perform his past relevant work as

16

a garbage truck driver.   However, the ALJ found, based on her RFC finding and

testimony from a vocation expert ("VE"), that Plaintiff could perform other work and was

therefore not disabled.

In this action, Plaintiff now maintains that the ALJ erred when making her RFC

finding.   More specifically, Plaintiff argues that the RFC finding "was based upon the

ALJ's own lay interpretation of bare medical findings rather than substantial evidence."

On this point, Plaintiff insists that the ALJ must have relied on her own "lay interpretation

of bare medical findings," since she did not give "controlling or significant weight" to any

of the medical opinions:

> The ALJ assessed Plaintiff with an RFC that was not supported by
> substantial evidence, and, rather, it was based upon her own lay
> interpretation of bare medical findings, as evidenced by the ALJ's failure to
> give controlling or significant weight to any of the physical medical
> opinions of record, and as evidenced by the highly specific RFC that was
> not supported by medical opinion or functional assessment evidence.
>
> ***
>
> [T]he ALJ did not give controlling or significant weight to any of the
> medical opinions, both physical and mental, so it is reasonable to assume
> that the ALJ must have relied upon the raw medical data to form her own
> common sense RFC, equating Plaintiff's complex physical and mental
> impairments to limitations with no basis.

Pl. Memo of Law at p. 17.   As support for this legal argument, Plaintiff cites a number of

district court decisions.   Plaintiff also contends that the ALJ failed to develop the record

by not obtaining an IQ test for Plaintiff. See, Pl. Memo of Law at pp. 25-26 ("[The ALJ]

failed to develop the Case record for IQ testing, as suggested by Dr. Juriga, despite

questions about Plaintiff's intellectual capabilities.").

The Commissioner disputes Plaintiff's contentions and maintains that the ALJ's

decision is free of legal error and supported by substantial evidence.

The Court has reviewed the entire record and the submissions of the parties.

DISCUSSION

As indicated earlier, Plaintiff maintains that the RFC finding "was based upon the ALJ's own lay interpretation of bare medical findings rather than substantial evidence," and that the ALJ should have obtained an IQ test for Plaintiff.

At the outset, the Court finds that Plaintiff's argument concerning IQ testing lacks merit.   In this regard, it is of course well settled that an ALJ has a duty to develop the record in certain instances, and that the ALJ's failure to do so may warrant a remand:

> Where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal. The ALJ's duty to develop the record reflects the essentially non-adversarial nature of a benefits proceeding. An ALJ's failure to develop the record warrants remand.

*Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (citations and internal quotation marks omitted).   However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Guillen v. Berryhill*, 697 F. App'x 107 at 108.

As a preliminary matter, the Court notes that Plaintiff's attorney did not, in her pre-hearing submission, include low intelligence as one of Plaintiff's many alleged impairments, nor did she suggest that the record was incomplete with regard to IQ testing.

More importantly, the Court observes that Plaintiff's "failure-to-develop-the

record" argument is based on a mis-reading of the record.   As noted earlier, Plaintiff argues that the ALJ "failed to develop the case record for IQ testing, *as suggested by Dr. Juriga*." Pl. Memo of Law at pp. 25-26 (emphasis added).   Indeed, Plaintiff asserts that Juriga expressed a medical opinion that IQ testing was necessary.   However, it was actually Dr. Juriga who, in response to a request for advice from a disability analyst, indicated that further IQ testing was not necessary. (Tr. 635-637).[11]

Besides that, as already mentioned, the administrative record already contains several IQ test results, performed while Plaintiff was in school, which indicate full-scale scores between 72 and 84. (Tr. 284-288, 635).[12]   Moreover, various evaluators, including Ippolito, have estimated that Plaintiff's IQ is below average.[13]   Accordingly, there was no shortage of evidence in the record concerning Plaintiff's intelligence.

Additionally, the ALJ limited Plaintiff to performing simple, routine, repetitive tasks that would not require a high level of attention to detail (Tr. 26-27),[14] and Plaintiff does not allege that his IQ was too low for such work.   Consequently, it is unclear to the Court what Plaintiff believes would have been gained by obtaining further IQ testing.

---

[11]  Plaintiff's confusion on this point might be due to the way in which the exhibit (Exhibit B29F) was described in the administrative transcript's table of contents, namely, as "Electronic Request for Medical Advice, dated 04/0402016 to 04/05/2016, *from Junga [sic] S.*" (Tr. Index 4). However, the request was not from Juriga was but was sent to Juriga by an unnamed analyst.   This error in describing the exhibit was also made with regard to the preceding exhibit, Exhibit B28F, which is listed as a request for medical advice '*from* Marasigan, L.," but which is actually a request by an analyst named S. Colaccico directed to Dr. Marasigan. (Tr. 633-634).

[12]  Plaintiff's attorney referred to those documents (Exhibit B1F) in her pre-hearing memorandum. (Tr. 281)).

[13]  Tr. 290, 626, 650.   Although some evaluators have opined that Plaintiff's intelligence is average. (Tr. 294, 924).

[14]  This, even though Plaintiff has demonstrated that he is capable of much more complicated and mentally-demanding work, such as driving a garbage truck, which also presumably requires a commercial driver's license.

He does not, for example, suggest that such testing would have shown that he met a listed impairment based on low intelligence.

For all of these reasons, Plaintiff's contention, that the ALJ erred by failing to develop the record with regard to IQ testing, lacks merit.

The Court similarly finds no merit to Plaintiff's contention that the ALJ improperly relied on her own lay opinion, rather than on competent medical evidence, when making her RFC determination.

On this point, it is well settled that an ALJ cannot arbitrarily substitute his own lay opinion for competent medical opinion evidence. *See, e.g., Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("[T]he ALJ cannot arbitrarily substitute h[er] own judgment for competent medical opinion." *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)."). However, an ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical opinion. *See, Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical judgment for expert opinion, stating that: "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir. 2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on, inter alia, the testimony of Camille that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations

20

omitted).

Notably, in *Matta* the ALJ had found that the claimant had only "moderate" limitations in social functioning, even though a doctor had opined that the claimant had "marked" limitations in social functioning, and even though no doctor had indicated that the claimant had only moderate limitations. *Matta*, 508 F. App'x at 55-56.   However, the Second Circuit indicated that the ALJ had not erred, since the RFC finding was consistent with the record as a whole. *See, id.* at 56 ("Plaintiff asserts that the ALJ substituted his own medical judgment for these expert opinions in concluding that "substantial evidence revealed [plaintiff's] condition stabilized and at the most, he had moderate symptoms."   We disagree.   Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

Plaintiff here contends that the ALJ ran afoul of these rules and arbitrarily substituted her own judgment for competent medical opinion, since she made detailed RFC findings without giving controlling or substantial weight to any single medical opinion, but, rather, gave "partial weight" to several opinions.   However, contrary to Plaintiff's argument, there is no such rule requiring remand under these circumstances. Another judge in this district recently rejected this same argument from a claimant, explaining:

> This Court [is] unpersuaded by [the plaintiff's] argument that whenever an ALJ does not give significant or controlling weight to any medical opinion, he automatically creates a gap in the record.   That may be true in some

circumstances, *see, e.g., Kiggins v. Comm'r of Soc. Sec.*, 2019 WL 1384590 at *5 (W.D.N.Y. Mar. 27, 2019) (holding that it was "reasonable to assume that the ALJ must have relied upon the raw medical data to form his own 'common sense' RFC" because he failed to give "controlling or significant weight" to any opinion), but it is not always true; rather, it depends on the facts and analysis in each case.

*** 

The plaintiff cites a number of district court cases, including *Kiggins*, for the proposition that by rejecting the opinions in the record, the ALJ substituted his lay opinion or created a gap.   But courts in this circuit also have held that failure to give any one opinion controlling weight does not mean that the ALJ substituted his lay opinion or opened a gap in the record. *See, e.g., Wynn v. Comm'r of Soc. Sec.*, 342 F. Supp. 3d 340, 349 (W.D.N.Y. 2018) (holding that ALJ's determination was supported by substantial evidence because, even though the ALJ did not assign controlling weight to any one opinion, there was not an absence of opinion evidence when the ALJ discussed four separate opinions in reaching his RFC determination); *Currie v. Comm'r of Soc. Sec.*, 2018 WL 5023606 at *3 (W.D.N.Y. Oct. 17, 2018) ("Simply because the ALJ afford[s] no single opinion controlling weight does not mean ... that she substitute[s] her own expertise of the medical proof for medical opinion."). Those holdings are not necessarily, or even likely, inconsistent. Social security disability appeals are highly fact intensive, and decisions are often specific to unique circumstances in each case. Here, for example, the ALJ's careful analysis and balancing of several opinions given some weight provide enough support for his RFC.

*Lori M. v. Comm'r of Soc. Sec.*, No. 19-CV-1629-LJV, 2021 WL 230916, at *4, n. 7

(W.D.N.Y. Jan. 22, 2021) (citations to record omitted) (Vilardo, J.).

Here, the ALJ did not rely on her own judgement, but, rather, she carefully and

thoughtfully discussed each of the medical opinions and only accepted so much of each

opinion as was consistent with the medical evidence overall.   In that regard, the ALJ

did exactly what she was supposed to do.   Moreover, for practically every limitation

contained in the RFC finding, the ALJ included a citation to evidence in the record

22

supporting the limitation. (Tr. 29-32).   Consequently, the Court cannot agree with

Plaintiff's assertion that the RFC findings are unsupported by substantial evidence.

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the

pleadings (ECF No. 12) is denied, Defendant's cross-motion (ECF No. 16) for the same

relief is granted, and this matter is dismissed.   The Clerk of the Court is directed to

enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        February 22, 2021

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge